## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM PETERS, a citizen of Virginia, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| KALEYRA, INC., a Delaware Corporation, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Plaintiff William Peters alleges as follows:

## INTRODUCTION

1.      This is a lawsuit about a corporation's vendetta against a whistleblower.  The Plaintiff, Mr. William Peters, repeatedly called to the attention of his superiors the questionable practices of Defendant and its subsidiaries.  Mr. Peters also led an effort to buy one of Defendant's subsidiaries to ensure that it would be owned by United States citizens instead of a foreign entity with direct and indirect ownership by foreign nationals.  The Defendant viewed Mr. Peters as a troublemaker and deliberately manufactured an excuse to fire him for cause and in the process frame him for a computer break in and defame him.

2.      Through this action, Mr. Peters seeks redress for the Defendant's malicious and underhanded campaign against him.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 as the Defendant is a Delaware Corporation and thus resides in this district.

## THE PARTIES

5.    Plaintiff William Peters is an individual and resides in the Commonwealth of Virginia.  Mr. Peters is a retired U.S. Air Force Major, co-founder and former Chief Financial Officer of The Campaign Registry, an indirect, wholly-owned subsidiary of Kaleyra, Inc.  Mr. Peters' 40-year career includes distinguished service in the U.S. Air Force, working at General Electric in Finance, and over two decades of founding, growing and selling startup companies.

6.    Mr. Peters has been in the mobile telecommunications industry for roughly 23 years, beginning as a founder and VP of Finance of InphoMatch/Mobile 365, a successful startup in the messaging space.

7.    More recently, Mr. Peters co-founded Buc Mobile, Inc. ("Buc Mobile") and Campaign Registry, Inc. ("The Campaign Registry" or "TCR"), which were acquired by Kaleyra S.p.A (which subsequently became a wholly-owned subsidiary of Kaleyra, Inc.) in August of 2018. After that acquisition, Mr. Peters became the U.S. V.P. of Finance with primary responsibility for all related American entities, including Kaleyra Inc, Buc Mobile. Inc., and Campaign Registry Inc. (USA). He also managed all banking and treasury operations for these U.S. entities and was responsible for assisting in additional acquisitions. He was granted Power of Attorney by the Kaleyra, Inc. Board of Directors to conduct the business needs of The Campaign Registry as needed without additional approvals, such as purchasing, adding vendors and customers, entering NDAs, and processing banking transactions within certain limits.

8.    Defendant Kaleyra, Inc. ("Kaleyra") is a publicly traded Delaware corporation with a New York address but its principal place of business and its functional headquarters is in Milan, Italy.

9.     In 2019, Kaleyra S.p.A., a private Italian software company, entered into a transaction with Gig Capital, Inc., a special purpose acquisition company ("SPAC") whose stock or shares were registered and traded publicly on a U.S. stock exchange. Gig Capital, Inc. was a shell company without employees or operations. It was formed by the Gig Capital Group for the sole purpose of raising approximately $145 million from investors through an Initial Public Offering ("IPO"), merging with a private company with employees and operations and using the funds raised to operate the merged company and pay millions of dollars in expenses connected to the merger. The merged company would then assume the name of the private company, and, by virtue of Gig Capital, Inc.'s registration status, the shares of the merged entity would be publicly traded.

<u>**CORPORATE STRUCTURE**</u>

10.     The following chart shows the corporate structure and ownership of the relevant players.



## NON-PARTIES

11.    **Kaleyra S.p.A** is an Italian Company and a wholly owned subsidiary of Kaleyra, Inc.

12.    **Buc Mobile, Inc**. is a Delaware Corporation and a wholly owned subsidiary of Kaleyra S.p.A.  Its activities and actions are controlled and directed by the officers and directors of Kaleyra, Inc.

13.    **Campaign Registry, Inc. ("TCR" or sometimes "The Campaign Registry"),** is a Delaware Corporation and a wholly owned subsidiary of Buc Mobile. Its activities and actions are controlled and directed by the officers and directors of Kaleyra, Inc.

## OFFICERS AND DIRECTORS OF RELEVANT ENTITIES
## AT THE TIME OF THE EVENTS IN SUIT

14.    At all relevant times, the directors and officers of these entities were as follows.

15.    **TCR Board:**

Giacomo Dall'Aglio – Director of Campaign Registry Inc and CFO of Kaleyra Inc

Soren Schafft – Director and CEO of Campaign Registry Inc.

Tor Soevik – Director and COO of Campaign Registry Inc.

16.    **TCR Officers:**

Soren Schafft – Director and CEO of Campaign Registry Inc.

Tor Soevik – Director and COO of Campaign Registry Inc.

William Peters – CFO of Campaign Registry Inc.

Michael Ford – VP Operations of Campaign Registry Inc.

17.    **TCR Other:**

Michael Ford – VP Operations of Campaign Registry Inc.

Eric Simmons – Network Operations Manager of Campaign Registry Inc.

Ricardo Cavero-TCR Head of Operations

18. **<u>Buc Mobile Board:</u>**

Dario Calogero-Director Kaleyra, Inc. and Buc Mobile, Inc.

Soren Schafft-Director of Buc Mobile, Inc.

Giacomo Dall'Aglio – Director of Buc Mobile and Director of Campaign Registry Inc and CFO of Kaleyra Inc.

19. **<u>Buc Mobile Officers:</u>**

Soren Schafft-CEO.

Bill Peters-Sr. V.P.

20. **<u>Kaleyra Board:</u>**

Avishay Katz – Executive Director and Chairman of the Board of Kaleyra Inc.

Neil Miotto – Director and Chairman of Audit Committee of Kaleyra Inc.

John Mikulsky – Director of Kaleyra Inc.

Dario Calogero – Director and CEO of Kaleyra Inc.

Matteo Lodrini – Director of Kaleyra Inc.

Emilio Hirsh – Director of Kaleyra Inc.

21. **<u>Kaleyra Officers:</u>**

Dario Calogero – Director and CEO of Kaleyra Inc.

Giacomo Dall'Aglio – Director of Campaign Registry Inc and CFO of Kaleyra Inc.

## <u>OTHER RELEVANT INDIVIDUALS AND ENTITIES</u>

22. Michael Remacle – Advisor to Soren Schafft. Mr. Remacle is a prior telecommunications entrepreneur who achieved a successful exit.

23. Franklin Court Partners – Consultant to Soren Schafft to help him with fundraising.

24.     Chandler & McCarthy – Legal advisor to Soren Schafft to help him with fundraising.

## **TIMELINE**

25.     The following timeline provides overall guidance for the events related to this suit.

Early 2020: Mr. Peters became aware of a variety of legal problems that Kaleyra and TCR should have addressed, and he brought these to the attention of various Officers and Directors.

January-July 2020: Mr. Peters identifies improper accounting of certain expenses and proposes that certain adjustments needed to be made in Kaleyra's financial statements.  The company ignores his advice, and he is demoted.

July 12, 2021:  Mr. Peters points out the legal requirements for registering and paying the USF fee and warns Kaleyra that it should not be associated with voice calls coming into the United States, a warning that Kaleyra ignores.

August 2021: Mr. Peters became aware that Kaleyra, through its wholly owned subsidiary, Buc Mobile, was delivering communications from its customers to Syria, Cuba, Democratic Republic of the Congo, Iran, Iraq, Lebanon, Libya, North Korea, Qatar, Saudi Arabia, Syria, and Yemen. Mr. Peters raises this issue as a concern in meetings, including meetings where Mr. Calogero participated.

April 2022:  Kaleyra has discussions with Twilio about Twilio buying Campaign Registry, Inc.

May 2022: Mr. Calogero, the CEO of Kaleyra, agrees to allow Mr. Peters and others to pursue a management led buyout of Campaign Registry, Inc.

May 13, 2022: Campaign Registry, Inc. and Mr. Tarone enter into a mutual NDA for purposes of allowing Mr. Tarone to receive information about Campaign Registry, Inc. so he can pursue financing for a buyout.

June 9, 2022: Mr. Tarone, on behalf of TCR Acquisition LLC, sends a letter to Avi Katz, the Chairman of the Board of Kaleyra, Inc., offering to buy Campaign Registry, Inc. for a price to be determined.

June 30, 2022: TCR Acquisition LLC offers to buy Campaign Registry, Inc. for $19 million.

July 13, 2022: Kaleyra rejects TCR Acquisition's offer to buy the Campaign Registry without having ever met with any of the principals of TCR Acquisition.

6

July 13, 2022: Campaign Registry terminates the NDA with Mr. Tarone.

September 2022: Mr. Peters raises concerns about TCR being complicit in election interference.

September 19, 2022: Mr. Peters files sends an email to CFIUS.tips@treasury.gov pointing out that despite the foreign ownership of Campaign Registry, Inc., there had never been a CFIUS review.

September 26, 2022: Mr. Peters offers to buy Campaign Registry, Inc. for $40 million.

October 4, 2022:  Mr. Peters is placed on administrative leave.

October 5, 2022:  Mr. Schafft goes to Mr. Peters' home to collect his computer and work with Mr. Peters to change all his passwords.  By the end of the day Mr. Peters has no access to any Kaleyra or TCR computer system.

October 6, 2022: Campaign Registry executives direct and fabricate a computer break in and blame Mr. Peters for it.

On October 13, 2022:  Mr. Peters sent an email to Avi Katz, Chair of the Board of Directors of Kaleyra, reporting his concern that there was a conspiracy in progress to defraud the shareholders and bondholders.

October 17, 2022: Mr. Peters is wrongfully terminated.

## BACKGROUND INFORMATION ON TECHNICAL ITEMS AND REGULATION

26.    **CFIUS.**   The Committee on Foreign Investment in the United States.  CFIUS is an inter-agency committee of the United States government which reviews the national security implications of foreign investments in U.S. companies or operations.  CFIUS is chaired by the United States Secretary of the Treasury, and it includes representatives from 16 U.S. executive departments and agencies, including the Departments of Defense, State and Commerce, as well as (most recently) the Department of Homeland Security. Additionally, certain White House offices observe and participate, if needed. These offices include the Office of Management & Budget, Council of Economic Advisers, National Security Council, Homeland Security Council, and National Economic Council.  All companies proposing to be involved in an acquisition by a foreign firm are supposed to voluntarily notify CFIUS, but CFIUS can review transactions that

7

are not voluntarily submitted.  CFIUS provides close scrutiny to acquisitions of critical

infrastructure including telecommunications.

27.    **A2P messaging.**  Application-to-Person messaging.

28.    **10DLC**.  Ten Digit Long Code used to send A2P text messages.

29.    **Short Code:**  A 4-6 (typically 5) digit number provisioned by operators for

sending A2P text messages.

30.    **USF Tax**:  Universal Service Fund Tax.  A fee levied by the Federal

Communications Commission.

31.    **SMS:** Short Message Service.  Commonly referred to as text messaging.

32.    **CSP**: Campaign Service Providers.

33.    **VoIP:** Voice over Internet Protocol.

34.    **SPAM Texts**: A plague on the citizenry.

## CAMPAIGN REGISTRY, INC.

35.    The business concept that would become the Campaign Registry started in 2015

within Buc Mobile, Inc., which is a U.S.-based SMS delivery vendor for domestic and

international companies. Buc Mobile was acquired in August 2018 by Kaleyra SpA. At that time,

a CFIUS review was apparently recommended but not mandatory. In October 2019, the

Campaign Registry became commercially viable and was spun out into Campaign Registry, Inc,

and remains a wholly owned subsidiary of Buc Mobile. In November 2019, Kaleyra SpA was

acquired by Gig Capital, Inc., which then changed its name to Kaleyra Inc and ticker to KLR.

The headquarters of the company is in Milan, Italy.  From the beginning, the officers of Kaleyra

are Italian, and foreign nationals directly and indirectly own a substantial portion and probably a

majority of the company.  However, at no point during any of these acquisitions of significant US

telecom (SMS) assets was an actual CFIUS review of the transaction conducted.

36.     In 2019, the wireless carriers selected Campaign Registry Inc. to provide the 10DLC (Ten Digit Long Code) registry services to the text-messaging industry as a sanctioned monopoly, in a purported attempt to combat text-messaging spam.  TCR is responsible for vetting the companies sending the messages, which are known as the Campaign Service Providers (CSP).  In addition, TCR vets the "Brand" that is responsible for the content (*e.g.*, Wells Fargo, Coca Cola, etc.).  The Brand is responsible for identifying the "use case" of each campaign, so TCR can validate that the SMS campaign is complying with its stated purpose.

37.     All A2P (Application-to-Person) SMS campaigns need to have their CSP register the campaign with TCR to be able to transmit their SMS without being subjected to strong anti-spam controls.

38.     From TCR's website:

TCR™ works with North American mobile operators and companies that are in the messaging business to register Application-to-Person (A2P) text messaging Campaigns. The registry supports a sanctioned A2P 10 Digit Long Code (10DLC) text messaging Campaign ecosystem and provides visibility into the messaging source and content, allowing mobile carriers to provide a more reliable and simple messaging service for Campaign Service Providers (CSPs) and Brands

https://www.campaignregistry.com/what-is-campaign-registry/ (Accessed 9-11-23).

39.     The existence of TCR has done nothing to slow down the proliferation of Spam.

**OVERVIEW OF MR. PETERS' WHISTLEBLOWING ABOUT ILLEGAL CONDUCT**

40.     Beginning in 2020, Mr. Peters became aware of a variety of legal problems that Kaleyra and TCR should have addressed, and he brought these to the attention of various Officers and Directors. In summary, these problems involved: (1) failure to report to federal regulatory authorities and failure to pay millions of dollars' worth of Universal Service Fees to the United States government; (2) continued delivery of messages into embargoed countries; (3) CFIUS problems; (4) improper accounting; (5) election interference involving the Campaign

Registry; and (6) actions to defraud the shareholders and bondholders of Kaleyra.   Mr. Peters reported all of these problems to senior officers within Kaleyra and even agreed to be interviewed by Kaleyra's outside counsel regarding these matters.  He additionally reported these issues to the relevant government agencies, including the SEC, CFIUS, FBI and the NSA.

## MR. PETERS RAISES CONCERNS ABOUT KALEYRA'S FAILURE TO REPORT TO FEDERAL REGULATORY AUTHORITIES AND FAILURE TO PAY MILLIONS OF DOLLARS' WORTH OF UNIVERSAL SERVICE FEES

41.    Several times in the history of Buc Mobile, the company reviewed the consequences of delivering VoIP traffic from abroad into the United States, and decided not to do so. Delivering VoIP calls to or from the United States requires registration with the FCC and submitting mandatory quarterly filings and fees/taxes. Failure to do so can result in severe fines and penalties, and carrying out this business would expose the United States revenue stream to upwards of 30% in USF fees (payable retroactively).

42.    The Kaleyra team asked about this in June 2021.  On June 29, 2021, Mr. Peters sent an email to Adrian Chavez, VP of Latin American sales, stating: "Well, I think India is doing voice already, so maybe they can help. However, we want to keep "voice" away from US based messaging because the USF can kill us.   Here is a conversation I had with Prakash (product manager in Bangalore) this morning."  Mr. Prakash begins the conversation by saying: "Hi Bill, Prakash this side, I handle Voice Product in Kaleyra. Need your help. Is Kaleyra registered with FCC? If yes, do we have FCC Registration Number (FRN)?"

43.    In response, Mr. Peters stated: "Hi Prakash. No, we are not registered with the FCC. We don't want to be subject to USF or regulation, so we have stayed away from them."

44.    In the same email conversation, Mr. Peters stated:

entering the US Voice market is a very premeditated move. haphazardly launching a product can get you into huge trouble. This is a Dario level decision after much review

and a full business plan to model the impact on the rest of the company. Soren and I looked into this in great detail 3 years ago and decided that we would never do it.

The reason we never pursued voice is that once you do, everything sold in the USA potentially becomes subject to the USF tax, which is 18-20% of the gross amount. That tax if applied to Buc/mGage would cost the company up to $20M per year on existing revenue. (20% of 100M) Once you apply to the FCC and become subject their filing requirements and taxes, you are stuck with them forever. No going back. Sort of like jumping off of 100 story building onto street with heavy traffic. At 99th floor it is too late to change your mind.

45.    On July 12, 2021, Mr. Francesco Vizzone, VP Legal & Compliance for Kaleyra, sent Mr. Peters an email that asks: "With regard to our next quarterly filing (10Q for Q2 2021), is there any active/passive legal proceeding we need to know about for Buc?"

46.    In response, Mr. Peters states:

All is currently quiet on the legal front for Buc Mobile. However, there is one concern I have, and it relates to regulatory and tax. My understanding is that India is working with voice and would like to work with VoIP traffic that terminates in the US. This needs to be approached very cautiously with both eyes wide open. A misstep within the Kaleyra group could not only subject us to FCC regulation (a major hassle) but it also could subject some or all of our US revenues (mGage + Buc) to Universal Service Fund taxes amounting to over 30% of gross sales.

47.    Despite Mr. Peters pointing out the legal requirements for registering and paying the USF tax, Kaleyra ignored his warnings as demonstrated on the Kaleyra website, which showed a product demonstration video about how to send VoIP calls to the United States.  To Mr. Peters' knowledge, Kaleyra has never paid the USF tax for these calls.

## MR. PETERS RAISES CONCERNS ABOUT KALEYRA'S CONTINUED DELIVERY OF MESSAGES INTO EMBARGOED COUNTRIES

48.    On or about August 2021, Mr. Peters became aware that Kaleyra, through its wholly owned subsidiary, Buc Mobile, was delivering communications from its customers to Syria, Cuba, Democratic Republic of the Congo, Iran, Iraq, Lebanon, Libya, North Korea, Qatar, Saudi Arabia, Syria, and Yemen.

49.     Specifically, Mr. Peters became aware that Kaleyra entered into an agreement with a company in Lebanon to manage the delivery of SMS into Syria via MTN Syria. Kaleyra agreed to pay 577,500 EUR in delivery costs for the communications traffic. As part of agreeing to pay the delivery costs, Kaleyra had the Lebanese company agree not to violate U.S. laws or embargoes. Kaleyra purportedly halted the arrangement on or about August 2021. However, as of August 2022, Kaleyra was still delivering traffic to Syria.

50.     Mr. Peters participated in discussions and pointed out that this was a problem. Others involved in these discussions included Jessica Luke, Chief of Legal for the United States entities, the United States finance team, Dario Calogero, CEO of Kaleyra and other people.

51.     Upon information and belief, Kalerya continues to facilitate through intermediaries the delivery of communications traffic to Syria, Cuba, The Democratic Republic of the Congo, Iran, Iraq, Lebanon, Libya, North Korea, Qatar, Saudi Arabia, Syria, and Yemen.

**MR. PETERS RAISES CFIUS CONCERNS**

52.     Mr. Peters had repeatedly raised concerns internally about Kaleyra's refusal to seek CFIUS review of its ownership of Campaign Registry, Inc.

53.     On September 19, 2022, Mr. Peters sent an email to CFIUS.tips@treasury.gov.  In this email, he stated:

> I am the CFO of Campaign Registry, Inc., which is a wireless carrier sanctioned monopoly serving as the registry for all US SMS campaigns. We have contracts with all major US operators including AT&T Wireless, Verizon Wireless, T-Mobile and US Cellular. They require all organizations using SMS campaigns to register with us and are relying on us to properly vet and register SMS campaigns. The carriers are using our registry to know which SMS to allow freely into their networks and which SMS to subject to strong anti-spam controls. In our registry are not only commercial SMS campaigns, but also information for SMS campaigns for First Responders, K-12 Educational, government organizations, politicians and political campaigns, and 501-C3/C4 organizations. In total, there are nearly 2 million campaigns with full visibility on who is running the campaign, what its purpose is and which phone numbers they are

using. In the wrong hands, this data could be used to sabotage corporations, political campaigns, and create chaos in innumerable ways.

Campaign Registry Inc was started as a business concept in 2015 within Buc Mobile, Inc., which is a US based SMS delivery vendor for domestic and international companies. Buc Mobile was acquired in August 2018 by Kaleyra SpA. At that time, a CFIUS review was apparently recommended but not mandatory. In Oct 2019, the Campaign Registry became commercially viable and was spun out into Campaign Registry, Inc, and remains a wholly owned subsidiary of Buc Mobile. In Nov 2019, Kaleyra SpA was acquired by Gig Capital, Inc., which was a Special Purpose Acquisition Company (SPAC) or "blank check" company with no operations. Following the acquisition of Kaleyra SpA, Gig Capital Inc, which had been trading as NYSE: GIG changed its name to Kaleyra Inc and ticker to KLR. The headquarters of the company is in Milan, Italy. In June 2021, Kaleyra Inc acquired mGage LLC, a US based SMS delivery aggregator for $215M. From the beginning, the officers of Kaleyra are Italian, the majority of the ownership of Kaleyra is Italian and Chinese, and the company headquarters is in Milan Italy. However, at no point during any of these acquisitions of significant US telecom (SMS) assets was an actual CFIUS review conducted.

54.    Further, as set forth in more detail below, friends of Mr. Peters very publicly raised concerns about the foreign ownership of Campaign Registry, Inc.  Kaleyra was well aware of these publicly raised concerns by Mr. Peters' friends and Kaleyra executives were angry that the foreign ownership of Campaign Registry was receiving so much attention.

### MR. PETERS RAISES CONCERNS ABOUT IMPROPER ACCOUNTING

55.    In 2020, Mr. Peters raised concerns about financial reporting, reconciliation, and proposed adjustments relating to the 2019 Q4 GMT Global Messaging Platform ("GMP") vendor costs accruals which were recorded by Buc Mobile ("Buc") on behalf of Solutions Infini FZE ("FZE"), which provides SMS platform delivery services.

56.    The following is a relevant timeline of events:

**January 2020**

- One of the GMP vendors – Jersey Telecom ("JT") – contacted Buc Mobile and demanded payment in its opening balance of EUR 113,710.91. Buc Mobile was not aware of such balance, thus requested the corresponding invoices. It turns out that JT's November 2019 and December 2019 invoices were issued to FZE not Buc Mobile.

- Mr. Peters checked with FZE and found out that these invoices were neither paid nor recorded by FZE. Under the threat that JT would shut down the connection had payment not been made, Buc Mobile requested JT to reissued the invoice to Buc Mobile instead. However, JT refused to do so since its book was closed. At last, to keep the network connection open, Buc Mobile had to record these FZE invoices under its own COGS (cost of goods sold) in January 2020, and paid the full amount of EUR 113,710.91 on February 6, 2020. Under the impression that this was only an incidental event, Buc Mobile chose to recover such amount through intercompany ("I/C") billings in Q4 2020.

**February 2020**

- Another GMP vendor – Infobip – contacted Buc Mobile and demanded payment on its opening balance of EUR 417,448.26. Buc Mobile was not aware of such balance, thus requested the corresponding invoices. Like in JT's case, Infobip's October 2019, November 2019, and December 2019 invoices were issued to FZE not Buc Mobile. Buc Mobile checked with FZE and found out that these invoices were neither paid nor recorded by FZE in 2019 Q4.

- Concerned that there may be more unrecorded invoices, Mr. Peters requested FZE to conduct an internal review on the GMP vendor costs for 2019 Q4. A provision file was shared by FZE which showed the breakdown of vendor costs provision per month. Buc Mobile reviewed FZE's 2019 Q4 provision and noticed that a total worth of EUR 937,449.63 in invoices (including the before mentioned JT and Infobip) were ignored by FZE.

- Given the significance of such amount, Mr. Peters and others held a meeting on February 3rd to discuss the unrecorded cost provisions (around EUR 690k). They discussed that FZE needed to record such provision through its COGS so that, at the consolidated level, the COGS will not be understated. Then, after FZE recorded and paid those invoices, FZE would issue an I/C invoice to Buc Mobile for the same amount. On February 11th, FZE indicated that the above invoice would be issued to Buc Mobile.

- In total, the Kaleyra books would have been misstated by 1.4 million EUR for Q4 2019 if Mr. Peters had not noticed the discrepancy in the FZE books and forced the issue of fixing it. Rather than appreciating catching the error before it was reported in the public company filings, he was demoted from Regional CFO, Americas to Head of Business Control, which is a junior finance individual contributor title. His RSU grant and bonus percentages were also cut dramatically. However, his duties and responsibilities remained the same and continued to increase, being that he was the only US citizen in finance in all of Kaleyra.

**June 2020**

- Actual invoices of EUR 417,448.26 (vs. EUR 413,168.3 from net provision) relating to Infobip were settled by Buc Mobile through net settlement and wire payment in June

14

2020. Actual invoices of EUR 199,708.09 (vs. EUR 203,869.16 from net provision) relating to Telecom Italia Sparkle. which presented similar issues, were settled by Buc Mobile through net settlement and wire payment in May and June 2020. Actual invoices of EUR 72,462.09 (vs. EUR 70,170.18 from net provision) relating to BICSs, which also presented similar issues, were net-settled against Buc Mobile's accounts receivable in 2020. All above invoices were originally issued to FZE but were ignored.

- For the above vendors, FZE and Buc Mobile's accounts had been merged starting in 2020, which is the reason why these vendors reached out to Buc Mobile for payment in 2020.

- Given that all actual invoices were paid by Buc Mobile, not FZE, the EUR 690k I/C invoice should have been issued the moment when FZE determined that it would not pay such amount to the vendors.

**July 2020**

- During the Q2 closing, Mr. Peters raised concerns that not reversing the EUR 690k I/C costs from Buc Mobile's P&L would cause the consolidated P&L to be misstated.

- In the meeting with the consolidation team on July 10th, FZE notified Buc Mobile that all the actual invoices have been booked on 6/30/2020 after Buc Mobile forwarded these to FZE at the beginning of July 2020.

- Mr. Peters raised concerns that doing so would potentially double count the costs, at the consolidated level, since these invoices were already recorded as COGS in Buc Mobile, unless Buc Mobile would make additional entries to reverse these COGS against I/C balances, which further complicates the process.

- Therefore, Mr. Peters had proposed to only reverse the I/C invoice issued from FZE to Buc Mobile in the form of a vendor credit memo.

57.    Giorgio Nava, the VP of Consolidation of Kaleyra informed both FZE and Buc Mobile on July 13th that the consolidation team decided to implement the adjustments.  The final decision was made on the basis that, on the consolidated level, the only P&L impact should take place in Q4 2019.

58.    Mr. Peters raised the concern that offsetting 3rd party vendor with I/C balance is not the proper adjustment on Buc Mobile's books. However, Mr. Peters' proposed adjustments were not accepted.   In the Q2 2020 financial report, Kaleyra's gross margin and net income were

overstated by 692K EUR, because COGS were understated by this amount.   Danilo

Roncasaglia, Regional CFO of Europe, allocated the error on a 50/50 basis between Solutions

Infini FZE and Buc Mobile in the report to the Board.  The reason he gave was that the margin

increase in FZE was too high and would be noticed.

### MR. PETERS RAISES CONCERNS ABOUT ILLEGAL ELECTION INTERFERENCE INVOLVING THE CAMPAIGN REGISTRY

59.     In September 2022, Campaign Registry operations personnel discovered election

interference aimed at certain Republican campaigns and in particular, the Kari Lake campaign

for Arizona Governor.  In September of 2022, someone using the handle "Forum83" and the

email address Forum83@yahoo.com was able to ultimately convince the companies delivering

political messaging to Arizona to stop all Republican messaging for the state for a couple weeks

in September of 2022.   Forum83 claimed it was all spam and played on the lack of knowledge of

support desk personnel.  The company that shut down the messaging was based in Chicago, but

the support desk person who shut off the messages for Arizona was a foreigner based in

Australia.   Forum83 also interfered with Republican campaigns in parts of California during

October 2022.  Mr. Peters learned all of this (and received the emails) from Ricardo Cavero.  Mr.

Cavero ended up dealing with Forum83 directly on a phone call, and that is how Mr. Peters

discovered Forum83's identity.

60.     When Mr. Peters and others learned what was happening, Mr. Peters asked Mr.

Cavero to report what he had learned to Campaign Registry management, specifically to Soren

Schafft, Tor Soevik, Stefan Heller and Michael Ford.  They told Mr. Cavero to let it go and not

do anything.

61.     Mr. Cavero did reach out to the company that initiated the blocking and got the messaging restored.   Mr. Peters reported this to the FBI through his attorney in September 2022 and by direct interview in Washington, DC on October 20, 2022.

62.     In October 2022, Mr. Cavero discovered that Forum83@yahoo.com was a person who, according to Opensecrets.org, is a frequent donor to Democrat politicians.

63.     Mr. Peters was also made aware of discussions between a major carrier of wireless communications in the U.S. and Campaign Registry executives on their weekly calls indicating a plan to influence elections by ensuring that certain organizations did not have the same access to messaging.  In particular, during one recorded call, Stefan Heller was discussing election influence with a  representative of that carrier who specifically stated that they needed to restrict the "Project Veritas' of the world."

64.     There are other audio recordings, one of which contains a conversation of Stefan Heller and representatives of that carrier discussing the restriction of the "Project Veritas' of the world" in and around the election timeframe.  Additionally, Campaign Registry management contracted with a "progressive" political advisory group to consult for Campaign Registry without any legitimate business purpose or proper company approvals.

65.     These activities by Kaleyra and TCR constitute illegal unreported campaign contributions in kind in violation of state and federal law and regulations.

## MR. PETERS INFORMS KALEYRA BOARD OF ACTIONS TO DEFRAUD THE STOCKHOLDERS AND BONDHOLDERS

66.    On October 13, 2022, Mr. Peters sent an email to Avi Katz, Chair of the Board of

Directors of Kaleyra, reporting his concern that there was a conspiracy in progress to defraud

Kaleyra's stockholders and bondholders:

> As an officer of both Buc Mobile and Campaign Registry and as a fiduciary of Kaleyra, I need to inform you of a developing situation. I believe that, based on the available evidence, there is conspiracy in progress to defraud the stockholders and bondholders, and you need to be aware of it. Based on the actions of others, I see a scenario developing where the foreign management of Kaleyra led by Dario essentially steals the company. I have seen other cases where a foreign (Indian) entity receives a huge payday by being acquired by a US company. Then, the Indian subsidiary hoards cash and resources in India. Later, the US company is starved for cash and goes bankrupt. The US owners cannot reach into India to reclaim anything. The Indian company then changes the name on the front of the building and continues operations. This scenario appears to be unfolding within Kaleyra. The sequence of events leading me to this conclusion is detailed below.

> **Q1/March 2022:**

> Early this year, Dario and his son Pietro become the subject of an SEC investigation.

> **April 2022:**

> Dario forces TCR management, very much against our candidly articulated better judgment, to pitch selling TCR to Twilio.

>> - Only later, I learned that Dario had already pitched selling all of KLR to Twilio. With Twilio not being interested in all of Kaleyra, he now tried to sell them just TCR.

>> - Based on subsequent events, it is very clear to me that you were not aware of this.

> **May 2022:**

> TCR management learns that Twilio was not interested in purchasing TCR.

> TCR management discusses proposing a management buyout and decides to request permission.

- Soren alone discusses this with Dario and Giacomo

- Soren tells us we have permission from Dario and Giacomo and confirms this in writing

TCR management begins to look for funding for a management buyout (MBO) Zephrim Lasker is hired. (as a new CEO??)

Kaleyra Board attempts to fire Dario but can't because of an even 3:3 split

**June 2022:**

TCR management pursues independent funding for an MBO

- Soren has no success, but I find funding through Mr. Tarone

- Soren tells Mr. Tarone that he will need to give the funds to Soren, so that he can cut a deal with Giacomo

- Mr. Tarone told Soren "that's not how this works" and decided to send the offer directly to you. We all know the rest of that part of the story, so I will not detail it here.

Kaleyra SpA began working on establishing Kaleyra Saudi Arabia.

**July 2022:**

The entire Kaleyra executive team has a meeting in Bangalore. (Dario, Giacomo, Filippo, Francesco, Mauro, Geoff and others) All of them were there for the first week of July and a few were there for the following week as well.

- The message given to the company was that the meeting was merely a "quarterly review"

- In my opinion, this was a planning meeting to establish a new center of gravity offshore far from the reach of you, the SEC and all of the public investors.

During the latter part of the month, Brian Mulroney and I receive several unusual requests from Danilo Roncasaglia (Regional CFO Europe).

- The first request from Danilo is to migrate all of our US bank accounts to newer accounts "to save money." These accounts would be jointly controlled by Kaleyra

19

SpA. Brian Mulroney (the US Treasury manager for Kaleyra US, Kaleyra Inc and the other formerly mGage properties) and I show Danilo the costs of such a move and shoot down the argument that it would be any less expensive.

- Danilo comes back to us a couple weeks later with a proposal to establish additional "parallel" accounts to all of our operating accounts that would be controlled by Kaleyra SpA alone.

- These accounts would be used by Kaleyra SpA to send funds to Italy "if there was a cash emergency." I never heard of such a thing before.

- I expressed concern about this to Danilo and to the US finance team, and no one has spoken about it since then.

The push to complete the formation of Kaleyra Saudi Arabia formation intensifies.

**Current Situation:**

Giacomo and Soren terminate me for a completely unfounded reason. They need to get me out of the way, because they know I will not be a party to any corrupt or illegal/unethical activity. They wait until right after the end of the quarter to sideline me, so they can bury it and not reveal it as a Q3 problem to the auditors.

Soren takes full control of the TCR operating bank accounts this week. No one in finance has access or approval oversight of the $7M account of TCR, and no one in finance can access the dual approval account for Buc Mobile at Wells Fargo.

Dario communicates to all of the employees internally (on Slack) last week that no one should worry about the bad stock price because he is the largest "stockholder in the cap table" and things are looking bright for Kaleyra's future.

The illegal delivery of SMS into Syria and other embargoed areas (Iran, Cuba, North Korea, Russia and others) has resumed and the entire industry knows this.

**KALEYRA ATTEMPTS TO SELL THE CAMPAIGN REGISTRY TO TWILIO**

67.     In early 2022, Kaleyra approached Twilio to explore the possibility of Twilio purchasing the Campaign Registry from Kaleyra.

68.     On April 13, 2022, Mr. Soren Schafft sent a memo regarding the proposed sale of TCR to Twilio.   In this memo, he indicated that Mr. Calogero, CEO of Kaleyra, had been

speaking with Twilio earlier in the week and was interested in discussing the potential sale.   Mr.
Schafft also mentioned in the very last line of the file, that "Should Twilio deal not go through,
move on to private equity option." This indicated that at least he and Mr. Calogero and Mr.
Dall'Aglio, CFO of Kaleyra had also discussed a spinout using private equity before April 13,
2022.

69.     On April 20, 2022, Mr. Peters, Mr. Calogero, Mr. Schafft, and Mr. Dall'Aglio had
a meeting with five people from Twilio.

70.     On April 21 and 22, 2022, Mr. Peters and others in TCR management updated a
presentation for Messrs. Calogero and Dall'Aglio in which they pointed out additional risk
factors to TCR from T-Mobile and iConectiv exploring an alternative to the Campaign Registry.

71.     Around this time, Twilio said it was not interested in buying the Campaign
Registry.

## KALEYRA AUTHORIZES MR. PETERS AND OTHERS IN TCR MANAGEMENT TO PURSUE FUNDING FOR A MANAGEMENT LED BUYOUT.

72.     On May 10 or 11, 2022, Mr. Schafft had a call with Messrs. Calogero and
Dall'Aglio and communicated the desire of TCR management to pursue funding for a
management led buyout of the Campaign Registry.  Mr. Schafft reported to Mr. Peters and others
that Messrs. Calogero and Dall'Aglio were in favor of doing that provided that they were not
shopping TCR to the industry.

73.     Thus, Kaleyra requested and authorized Mr. Peters and others at TCR to explore
the sale of TCR.  As part of this process Soren Schafft, Director and CEO of Campaign Registry
Inc., prepared a PowerPoint deck dated May 25, 2022.  Mr. Schafft did not place any
confidentiality markings on this deck.

74.     Prior to this, on May 13, 2022, Mr. Schafft and Giovanni Tarone, an experienced telecommunications executive, entered into a Mutual Non-Disclosure Agreement which stated in part:

> **THIS MUTUAL NON-DISCLOSURE AGREEMENT** (the "*Agreement*") is entered into between **Campaign Registry, Inc.** ("*TCR*") (the "*Company*") and **Giovanni Tarone** (the "*Consultant*") as of May 13th, 2022 (the "*Effective Date*"), to protect the confidentiality of certain confidential information of Kaleyra or of the Company to be disclosed under this Agreement solely for use in evaluating or pursuing a business relationship between the parties (the "*Permitted Use*"). Kaleyra and the Company may be referred to herein individually as a "*Party*" and collectively as the "*Parties*".

75.     The business relationship referred to in the NDA included financing for and/or the sale of The Campaign Registry.

76.     Previously, Mr. Tarone was CEO of Iris Wireless, one of three inter-carrier (ICV) messaging hubs, including SAP and Syniverse, when it successfully prosecuted one of the rare "refusal to deal" attempts to monopolize cases in *Iris Wireless LLC v. Syniverse Tech.*, 49 F.Supp.3d 1022 (M.D. Fla. 2014).   Mr. Tarone began his career in telecom as a pioneer in the calling card industry, building distribution and products that touched over 20% of U.S. international calling card traffic in the early 2000s. An experienced turnaround specialist, Mr. Tarone restructured TecNet in 2004 and led the 2006 buyout and the subsequent product and switching services of NACT. As an operator, Mr. Tarone was also CEO of Enhanced Prepaid Distribution, delivering $600 million per year in retail traffic revenue on the Vartec Telecom network.

77.     On May 19, 2022, TCR signed a Mutual NDA with Mr. Chandler of Franklin Court Partners to explore Private Equity funding.

78.     On May 20, 2022, TCR received preliminary feedback from CAS Law Firm (representing Franklin Court Partners) regarding the approach and LLC setup.

79.     On May 20, 2022, TCR personnel (Messrs. Peters, Schafft, and Soevik) had a call with Mr. Tarone to discuss financing options.

80.     On May 23, 2023, Mr. Schafft sent an email to Messrs. Calogero and Dall'Aglio to follow up on earlier communication to them about interest in pursuing an MBO strategy.

81.     On May 24, Mr. Schafft sent an email with information about TCR to Scott Chandler and Jay McCarthy, investment bankers, for purposes of selling TCR.  Mr. Peters is copied on that email.  The information referenced in the subject line of the email was: TCR USGAAP P&L 1Q21 - 1Q22.xlsx; TCR BS 1Q21- 1Q22 (1).xlsx; 2022.04.30 TCR Sales by Customer Unnamed.xlsx; 2022.04.30 TCR Revenue to Margin.xlsx; 2022.05.24 TCR Business Overview.pptx.

82.     The text of Mr. Schafft's May 24 email stated:

Please find attached files which we can review tomorrow including:
financials from 2021 pulled from the KLR ERP system (these were audited and have intercompany elements with Kaleyra, etc.)

- list of customers and revenue driven by each (shows the spread of revenue); I have blocked out the names of the customers (please note we have a pre-pay deal with our largest customer which provides them with discounts; no other CSP asked us for such a deal)

o  actuals and projections for this year

o  my deck from last time (slightly updated)

Once it is completed I will also send the following:

o  financial planning through 2027 (we should discuss this as a good amount of guesswork goes into planning this far ahead of such a new product)

Please consider all of this under our NDA and strictly confidential.

83.     On May 25, 2022, Messrs. Schafft, Soevik, and Peters had a call with Chandler McCarthy and Michael Remacle, who was an advisor to Mr. Schafft, regarding strategy.

84.    On May 25, 2022, Mr. Peters, pursuant to the NDA between TCR and Mr. Tarone, sent an email to Mr. Tarone with the May 24, 2022 business overview that had also been sent to others.

85.    On May 31, 2022, Mr. Schafft had a call with Mr. Dall'Aglio regarding the email sent to Messrs. Calogero and Dall'Aglio on May 23rd and confirmed approval to work on the MBO without shopping to the market.

86.    On June 1, 2022, Mr. Schafft  met with Mr. Remacle alone in Colorado to review strategy.

87.    Between May 26 and June 4, 2022 there were several discussions between Mr. Schafft and Mr. Tarone.  Mr. Tarone had funding sources identified and was ready to proceed.   These discussions ended with Mr. Schafft telling Mr. Tarone that Mr. Tarone would need to give him the funds to cut the final deal with Messrs. Calogero and Dall'Aglio.  According to Mr. Tarone, this request was so "out of line" that Mr. Tarone decided he was clearly talking to the wrong person and decided to pursue a different path directly to the Board, where the decision-making authority for this type of transaction rests.

88.    On July 13, 2022, Mr. Schafft wrote a letter to Mr. Tarone which stated in its entirety:

> Reference is made to the Mutual Non-Disclosure Agreement, dated as of May 13, 2022 (the "NDA"), between Campaign Registry Inc. (the "Company") and Giovanni Tarone.
>
> Pursuant to Section 10 of the NDA, the Company hereby terminates the NDA, effective 30 days the date hereof. Pursuant to Section 7 of the NDA, the Company hereby requests that you destroy (and certify such destruction in writing to the Company) all documents and other tangible materials representing the Confidential Information (as defined in the NDA) and all copies thereof and all derivative work product embodying any of the Confidential Information.
>
> In connection with your use of the Confidential Information, note that: (a) the Confidential Information may contain material non-public information concerning the

Company and its respective affiliates, (b) the United States federal and state securities laws, and the rules and regulations promulgated thereunder, place restrictions on persons and entities in possession of material non-public information and (c) any unauthorized use or release of material non-public information obtained under the NDA potentially creates significant legal exposure under said security regulations.

89.     The letter makes no reference to Mr. Tarone or anyone else misusing any TCR confidential information.

90.     This letter came one day after TCR Acquisition Corporation, an entity with which Mr. Tarone was affiliated, issued a press release about their offer to buy the Campaign Registry.

## TCR ACQUISITION LLC OFFERS TO PURCHASE THE CAMPAIGN REGISTRY

91.     On June 9, 2022, Mr. Tarone sent an email on behalf of TCR Acquisition LLC to Avi Katz, the Chairman of the Kaleyra Board with a cover letter, and a Letter of Intent for Stock Purchase with open-ended price requesting a mutually agreeable negotiation.  In this letter Mr. Tarone stated:  "Recently, senior management for The Campaign Registry ("TCR"), a wholly-owned subsidiary of Kaleyra, Inc. requested that I provide them with an evaluation of TCR's financial and commercial operations.  This letter contains a summary of my evaluation."

92.     No one ever disputed that senior management of TCR had requested that Mr. Tarone "provide them with an evaluation of TCR's financial and commercial operations. "

93.     The TCR Acquisition team was led by Frederick ("Rick") M. Joyce, Esq., who had over 40 years' worth of experience in the telecommunications/Internet sector with an emphasis on wireless, broadband and alternative services. Mr. Joyce was previously Chairman of Venable LLP's (an AmLaw 100 law firm) Telecommunications/Cybersecurity Group. After retiring from private practice, Mr. Joyce was hired by the U.S. Department of Homeland Security/U.S. Coast Guard to be Chief Counsel for cybersecurity and communications matters for the U.S. Coast Guard. Among his various duties included serving as Acting Chief Privacy

Officer for the U.S. Coast Guard and a wide range of governmental compliance matters, including Committee on Foreign Investment in the U.S. (CFIUS) transactions. Mr. Joyce held the Nation's highest security clearance, Top Secret/Secured Compartmented Information.

94.    On June 9, 2022, Mr. Schafft told Messrs. Calogero and Dall'Aglio that Mr. Tarone was acting on his own and did not send the offer to the Board at TCR management's request.   Risks to TCR's business and rationale for selling were also reiterated in the email to Calogero and Dall'Aglio.

95.    On June 20, 2022, the offer from TCR Acquisition expired.   No one contacted TCR Acquisition during this period to discuss the offer.

96.    On June 30, 2022, TCR Acquisition resent the offer, but changed it to include a priced offer of $19,460,000 million.

97.    On July 8, 2022, the offer expired.  No one contacted TCR Acquisition during this period to discuss the offer.

98.    On July 12, 2022, TCR Acquisition LLC issued a press announcement about TCR Acquisition's offer which included the following statements:

> According to Mr. Joyce: "In my view our proposal would be in the best interests of Kaleyra's shareholders, it would be in the public's best interests, and it would be in the best interests of all interested parties in the Applications to Persons (A2P) sector of the telecommunications industry. TCR's registry operations and network constitute 'critical infrastructure' of vital importance to U.S. national security interests. Moreover, this registry handles sensitive and confidential customer and carrier data."

> With regard to the alien ownership issues, Mr. Joyce stated as follows: "While to my knowledge the current foreign ownership of TCR has never undergone a CFIUS review, nevertheless, TCR ought to be independently owned by a U.S. entity for all the reasons stated in the CFIUS statutes and regulations. The team that is working with me consists of U.S. citizens who are experts in the field of telecommunications and Internet-based services. Our team has U.S.-based financial backing; our independent ownership of TCR would be in complete compliance with CFIUS statutes and regulations and relevant U.S. ownership requirements. Our prospective hiring plans will focus on U.S. telecom/IT

experts and U.S. Armed Forces veterans with IT backgrounds; our Board will consist of retired senior officers from the Armed Forces with proven IT/cybersecurity experience and experienced telecom/IT professionals."

Even if appropriate authorities were to determine that the GigCapital/Kaleyra merger was not subject to CFIUS laws and regulations, TCR Acquisition considers its U.S. ownership to be critical with regard to the services provided by and the data handled by The Campaign Registry. "I strongly believe that TCR should be independently owned by U.S. owners who are familiar with U.S. national security and telecommunications laws and who have experience working within the U.S. telecommunications industry," said Mr. Joyce. "With the 2022 federal political campaign season already underway, this Registry will be responsible for some of the most critically important message campaigns that will take place this year in the U.S. It is particularly important that this type of messaging campaign be handled in strict compliance with CFIUS and all applicable U.S. laws and regulations."

99.     The next day, on July 13, 2022, without conducting any due diligence on the offer,

Kaleyra rejected the offer.  TCR Acquisition Corporation issued a press release in response to the

rejection that stated:

"We are puzzled by Kaleyra's response," said Frederick ("Rick") M. Joyce, C.E.O. of TCR Acquisition. "Based on publicly available information, TCR Acquisition's offer to acquire The Campaign Registry represents roughly 20% to 25% of Kaleyra's total market cap for less than 5% of its overall annual revenues. Consequently, KLR management needs to explain to its shareholders and to TCR Acquisition why and how this offer 'significantly undervalues' Campaign Registry."

In addition, publicly available information referenced in TCR Acquisition's July 12 Press Release raises serious questions regarding alien ownership of The Campaign Registry and the Campaign Registry's critical communications infrastructure. Those issues have not been addressed by Kaleyra management and its Board of Directors in their press releases rejecting TCR Acquisition's offer. For reasons stated in TCR Acquisition's July 12 Press Release, it is TCR Acquisition's contention that The Campaign Registry should be independently owned and run by U.S. citizens who are committed to complying with all applicable U.S. laws, regulations and requirements.

100.    On July 25, 2022, Kaleyra made an SEC filing in which it stated that it is

"confident" that it is in compliance with the regulations and other laws administered by the

Committee on Foreign Investment in the United States (CFIUS).  The SEC filing was silent on whether there had been any CFIUS review by the United States government.

101.    On August 3, 2022, TCR Acquisition issued the following statement in response to Kaleyra's July 25, 2022 SEC filing:

> According to Frederick Joyce, C.E.O. and General Counsel of TCR Acquisition (www.tcr-acquisition.com), "[t]here is only one way to safely determine if Kaleyra's ownership of The Campaign Registry complies with CFIUS and the Foreign Investment Risk Review Modernization Act, and that is to have this matter reviewed by appropriate federal authorities, not by Kaleyra's executives and its paid attorneys. If Kaleyra's board and senior officers are confident that they have complied with CFIUS and other alien ownership requirements in the U.S., then they should be willing to submit this matter to U.S. governmental review."
>
> The Campaign Registry is the exclusive vendor used by all nationwide mobile telephone companies to verify who sends text messages and what is contained in text messages sent to mobile phones used by U.S. customers. This registry is responsible for screening billions of text messages sent to U.S. mobile phones every month. The senders of these text messages include public law enforcement and safety officials, state and federal election campaigns, not for profit organizations, and thousands of commercial entities.
>
> Increasingly, political campaigns around the country at all levels — from school boards to the U.S. Senate and the Presidency — are relying on text messaging as a convenient means of connecting and communicating directly with voters and supporters. The Campaign Registry plays a crucial role in authenticating and protecting these increasingly important communication channels. Public confidence in the integrity of The Campaign Registry is essential for maintaining and bolstering confidence in the electoral process. It is therefore particularly concerning that foreign ownership and interests could put a thumb on the scale of information flow - or could distort or bias these communication channels in favor of unknown or foreign goals. With 2022 federal election campaigns already in progress, and to ensure the integrity of the 2024 Presidential campaigns, it is critical that The Campaign Registry be owned by a transparent, U.S.-owned and operated entity."
>
> In 2018, Congress passed the Foreign Investment Risk Review Modernization Act (FIRRMA) — a major expansion of CFIUS's authority and a standardization of CFIUS processes — enacted largely in response to the threat that Chinese investments sought to dominate U.S. industries such as semiconductors,

artificial intelligence, robotics, and information technology, as well as to stem potential spying in widely used applications such as TikTok. Public filings with the Securities and Exchange Commission reveal that The Campaign Registry is owned and controlled by Chinese, Italian and Indian individuals and corporate entities.

"CFIUS review is just one area of concern here," said Frederick Joyce. "The more fundamental problem is that this critically important data registry, The Campaign Registry, with responsibility for screening and validating the entities and phone numbers that the mobile phone sector uses to send billions of messages every month, is owned and controlled by a foreign entity with funding from China and other foreign sources. This has the potential to seriously impact national security and personal data security. It is reasonable to assume that many if not most of the customers that use The Campaign Registry are not even aware of these Chinese ownership issues."

Two years ago, the government of Italy signed a Memorandum of Understanding with the People's Republic of China to participate in China's 'Belt and Road' program that seeks global dominance in every critical infrastructure sector. The fact that Kaleyra is headquartered in Milan, Italy, brings additional attention to this China connection. The high incidence of cyberattacks on Italian businesses provides another justification for ensuring that The Campaign Registry be independently owned by U.S. citizens and operated in accordance with the highest U.S. standards for cyber security and customer data privacy.

"TCR Acquisition" stands for 'Telecommunications Company Repatriation Acquisition.' According to Mr. Joyce: "That is our defining mission: to repatriate into the United States critical and essential telecommunications and Internet services that have been acquired, in whole or in part, by China and other foreign entities that intend to usurp U.S. technology for their own commercial and political benefit." Key members of the TCR Acquisition team have held the nation's highest security clearances and have served in senior positions in the federal government with respect to national security and public safety communications. "We couldn't be more serious about this mission, said Mr. Joyce. "Every member of the TCR Acquisition Team is firmly committed to 'bringing home' essential U.S. communications and Internet services starting with The Campaign Registry."

102.    On August 15, 2022, Mr. Tarone, on behalf of TCR Acquisition, published an

open letter regarding foreign ownership of the Campaign Registry.  Parts of that letter are set

forth below:

> We are writing to you on behalf of TCR Acquisition LLC, a U.S. owned and operated
> entity headquartered in Alexandria, Virginia. "TCR" stands for "Telecommunications
> Company Repatriation." Our defining mission is to repatriate into the United States
> critical and essential telecommunications and Internet services that have been acquired,
> in whole or in part, by China and other foreign entities that intend to usurp U.S.
> technology for their own commercial and political benefit.
>
> ****
>
> The Campaign Registry is the exclusive vendor used by every nationwide mobile
> telephone company to verify who originates and what is contained in text messages sent
> to mobile phones used by every U.S. customer. This registry is responsible for screening
> billions of text messages sent to U.S. mobile phones every month. The senders of these
> text messages include public law enforcement and safety officials, state and federal
> election campaigns, not for profit organizations, and thousands of commercial entities.
> The Campaign Registry's parent company is Kaleyra, Inc , a publicly traded company
> (stock symbol:KLR) that is foreign-owned and headquartered in Milan, Italy. Kaleyra
> was acquired in November of 2019 by GIGCAPITAL, Inc., a Special Purpose Acquisition
> Company, also known as a "blank check" company; following that acquisition the
> merged entity was renamed Kaleyra, Inc. At the time of that acquisition and to this
> date, Kaleyra has been providing cloud communications and business to consumer
> communications services throughout the United States, including TCR's registry
> services.
>
> At the time that Kaleyra was acquired by GIGCAPITAL, Kaleyra was owned by a
> collection of non-U.S. citizens, including Hong Kong Permanent Shine Limited, a
> company formed under the laws of the Hong Kong Special Administrative Region of the
> People's Republic of China, Esse Effe S.p.A, a company with shares formed under the
> laws of Italy, and a number of other foreign individuals.
>
> To this date, Kaleyra has refused to answer two very critical questions: What percentage
> of your company is owned, directly or indirectly, by individuals or entities associated
> with the People's Republic of China? And, do Chinese nationals and other foreign
> entities have access, direct or indirect, to the Campaign Registry's critical infrastructure
> and customer data? TCR Acquisition believes that Kaleyra refuses to respond because
> the answer to both questions is "yes."
>
> Because The Campaign Registry is owned and controlled by investors based in the

People's Republic of China, Italy and India, the national security and data privacy implications are obvious. Essentially every political campaign in the U.S., at the state, local and federal level, must be approved by The Campaign Registry prior to sending campaign messages to essentially anyone's mobile phone number. The same is true for not for profit entities and commercial entities. Should the People's Republic of China wish to have control over how or whether these text messages are conveyed, they could easily do so through ownership and control of The Campaign Registry and access to its relevant technology.

103.    This open letter triggered an aggressive response by Kaleyra to suppress any discussion of the foreign ownership of the Campaign registry.  On August 24, 2022, Kaleyra's outside law firm sent a cease-and-desist letter to TCR and its principals.  In that letter, Kaleyra's law firm said that no Chinese entity has access to any systems or processes of the Campaign Registry.  This statement appears to have been made without doing any investigation or was intentionally misleading.  At the time his letter was written a Chinese company had registered an account at The Campaign Registry.  The specifics regarding this company are as follows:

> SMRDIGZ
> Legal Name: T&I Net Communication Co., Ltd.
> Display Name: T&I Net
> Created on 2022-02-09 03:58:01
> Business ID: 91110108785512910D
> Address:
> DAZU Plaza, Tower 1, Floor 29, Yizhuang Economic and Technological Development Zone
> Beijing, Beijing, CN 100000
> email: yinlei@ti-net.com.cn
> phone: +8613488716880

104.    Kaleyra and the Campaign Registry should never have allowed this company to be registered.  After the company was registered, it did not register any brands or campaigns, but it was logging in and probing the system every 1-2 week until Ricardo Cavero, the head of operations at TCR, deactivated the account in September 2022.   Mr. Peters reported this to the National Security Agency and CFIUS.

105.    The August 24, 2022, cease and desist letter also made the following statement:

These statements—and your suggestion that The Campaign Registry needs to be "repatriated"—are patently false. The Campaign Registry is a Delaware corporation headquartered in McLean, Virginia, and its management team operates from its Virginia headquarters. It is wholly owned by Kaleyra, which is a U.S.-listed, publicly traded corporation that is also incorporated in Delaware, with principal executive offices in New York City. In short, The Campaign Registry does not need to be "repatriated"—it is already a United States company.

106.    This is legal sophistry and incorrect.  Although Campaign Registry, Inc. is a Delaware Corporation it has one shareholder, Buc Mobile, Inc., which also has only one shareholder, Kaleyra, S.p.A., a foreign corporation.  And although Kaleyra S.p.A. is owned by Kaleyra, Inc., which is a Delaware Corporation, its functional headquarters is in Milan, Italy and it is controlled by foreign nationals.  Kaleyra, Inc. is a holding company with no operations.  The CEO is Dario Calogero, a foreign national.  The EVP and Chief Financial officer is Giacomo Dall'Aglio, also a foreign national.  Approximately 30% of the shares of Kaleyra are owned by insiders and almost all of them are foreign nationals.  In addition, TCR has mostly foreign employees and contractors.  A significant portion of the engineering team is in China/Taiwan with employees in several other countries, including India, UK and Singapore.  Approximately 80% of TCR's employees and contractors are foreign nationals, many of whom have direct access to the confidential data within TCR's database.

## MR. PETERS OFFERS TO PURCHASE THE CAMPAIGN REGISTRY

107.    When it became clear that Kaleyra was not going to sell the Campaign Registry to TCR Acquisition, Mr. Peters decided to pursue a management led buyout.

108.    On September 26, 2022, Mr. Peters offered to purchase TCR from Kaleyra for $40 million.

109.    On October 10, 2022, Mr. Peters sent an email to the Kaleyra Board and its

officers stating:

> [A]s an officer and fiduciary to the Campaign Registry and Kaleyra, I must insist that, consistent with previous disclosures by you to Kaleyra shareholders regarding material events, you publicly disclose to all shareholders, if you haven't already, that you have received a binding Letter of Intent from me to purchase the Campaign Registry for $40 million, subject to due diligence and negotiation of mutually agreeable terms and conditions. You previously disclosed to shareholders another offer to acquire the Campaign Registry that was valued at less than $20 million, at a time when Kaleyra's market cap was roughly $80 million. The management buy-out proposal that I sent to you, at $40 million, is equal to the overall market capitalization of Kaleyra and is surely "material" to the company and to its shareholders. If you will not make such disclosures, please advise as soon as possible so that I can take appropriate steps as an officer and fiduciary of the Campaign Registry.

## MR. PETERS PLACED ON ADMINISTRATIVE LEAVE SHORTLY AFTER HE OFFERS TO BUY THE CAMPAIGN REGISTRY

110.    On October 4, 2022, at 3:43 p.m., Mr. Dall'Aglio, the CFO of Kaleyra, sent an

email with a letter attachment to Mr. Peters from his Kaleyra email account telling Mr. Peters

that he was being placed on administrative leave.  The letter attached to the email was written on

Campaign Registry, Inc. letterhead and purported to be sent on behalf of Campaign Registry's

Board of Directors.  Mr. Calogero, the CEO of Kaleyra, was copied on the email.  The purported

basis for placing Mr. Peters on administrative leave was that he shared confidential information

about TCR with Giovanni Tarone and that he was not authorized to do so.  That allegation is

false. The letter did not specify what information was wrongfully shared with Mr. Tarone.  The

letter further alleged that Mr. Peters' actions were taken as part of his and others plans to

purchase TCR from its parent company, Kaleyra, to benefit his personal interest.

111.    On October 4, 2022 at 4:00 PM all of Mr. Peters' access to company systems was

abruptly cut off and Soren Schafft contacted Mr. Peters to arrange for immediate pickup of his

laptop and all company files and other items.

112.    On October 4, 2022 at 8:48 p.m. Mr. Peters replied to Mr. Dall'Aglio.  In this response Mr. Peters states:

> I was very shocked and surprised to receive your email stating that I have been placed on administrative leave.  To be very clear: I have done nothing wrong, I have not shared confidential information regarding the Campaign Registry that was not protected by an NDA or unless it was information that was already publicly available from other sources.  You have not explained to me what "confidential information" it is that you contend I have shared with anyone outside of TCR without proper authorization, so you have made it impossible for me to appropriately defend myself.

113.    On October 4, 2022 at 11:17 p.m. Avi Katz, the Chairman of the Board of Directors of Kaleyra, sent an email to Mr. Peters acknowledging receipt of Mr. Peters' September 26, 2022 Letter of Intent offering to purchase TCR.  There are no accusations in Mr. Katz's email that Mr. Peters has done anything wrong in making an offer to purchase TCR.

114.    On October 5, 2022 at approximately 10:00 a.m., Mr. Soren Schafft picked up Mr. Peters' laptop and everything Kaleyra/TCR related.  From noon to about 5:00 p.m., Mr. Peters was on several phone calls with Eric Simmons (Security Manager) to change all of his passwords and the associated password reset information.  Mr. Peters had to receive several text messages with the access code that allowed him to change the account security and password reset contact information.   By 5:00 p.m. they were done, and Mr. Peters had no access to any system, nor did he have any ability to regain access by resetting password information.

115.    On October 6, 2022, Giacomo Dall'Aglio, the CFO of Kaleyra, sent an email to Mr. Peters' gmail address from his Kaleyra email account, and copied, among others, Avi Katz, the Chairman of the Board of Directors of Kaleyra, and Dario Calogero, the CEO of Kaleyra.  In this email, Mr. Dall'Aglio states that, notwithstanding whether there was an NDA in place with Mr. Tarone, which there was, Mr. Peters was prohibited from sharing confidential information with Mr. Tarone, citing section 1.1 of Mr. Peters' confidentiality agreement with TCR.

116.    However, section 1.1 of Mr. Peters' confidentiality agreement with TCR states in relevant part:

> At all times during and after my employment, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an <u>officer of the Company</u> expressly authorizes such in writing. (Emphasis added.)

117.    The "Company" is defined as TCR and Mr. Peters was an officer of TCR and thus had the right to disclose confidential information in connection with his work for the Company. In addition, he had been granted Power of Attorney by the Kaleyra Board of Directors to conduct the business of TCR on behalf of the parent company Kaleyra.

118.    As set forth above, Kaleyra had requested and authorized Mr. Peters and others at TCR to explore the sale of TCR.  As part of this process Soren Schafft, Director and CEO of Campaign Registry Inc., prepared a PowerPoint deck dated May 25, 2022.  Mr. Schafft did not place a confidentiality marking on this deck.

119.    Prior to this, on May 13, 2022, Mr. Schafft and Giavanni Tarone entered into a Mutual Non-Disclosure Agreement which stated in part:

> **THIS MUTUAL NON-DISCLOSURE AGREEMENT** (the "*Agreement*") is entered into between **Campaign Registry, Inc.** ("*TCR*") (the "*Company*") and **Giovanni Tarone** (the "*Consultant*") as of May 13th, 2022 (the "*Effective Date*"), to protect the confidentiality of certain confidential information of Kaleyra or of the Company to be disclosed under this Agreement solely for use in evaluating or pursuing a business relationship between the parties (the "*Permitted Use*"). Kaleyra and the Company may be referred to herein individually as a "*Party*" and collectively as the "*Parties*".

120.    The business relationship referred to in the NDA was the sale of The Campaign Registry.

121.    The only information that Mr. Peters shared with Mr. Tarone was a Powerpoint presentation that had been prepared by Mr. Schafft and was covered under the NDA that Mr. Schafft had in place with Mr. Tarone.

122.    Kaleyra and its officers and directors had a fiduciary duty to conduct a good faith evaluation of Mr. Peters' offer.  Instead of doing that they fired him.

**KALEYRA CAUSES TCR TO WRONGFULLY TERMINATE MR. PETERS**

123.    On October 17, 2022 at 1:15 p.m. Mr. Peters sent an email to the Kaleyra board and officers which stated:

> To my knowledge you have not yet informed KLR shareholders of my management buyout proposal. As an officer of Campaign Registry and a fiduciary of Kaleyra, I have a fiduciary duty to shareholders and an obligation to honor SEC disclosure requirements, as do you and my fellow officers. It is obvious that my management buyout proposal for the Campaign Registry, which is roughly equal to the market cap of Kaleyra, is a "material event." Consequently, if you do not disclose this material information to shareholders by close of business today my management group will issue the attached press release tomorrow.
>
> Please let me know how you wish to proceed.

124.    Later that day, at 9:57 p.m., Giacomo Dall'Agilio, the CFO of Kaleyra, sent an email and letter from his Kaleyra email account to Mr. Peters' gmail account stating that he was being terminated for "Due Cause" because he had wrongly provided information to Mr. Tarone, a statement that was demonstrably false as the only information Mr. Peters provided Mr. Tarone was a PowerPoint that was not marked confidential and further that there was a non-disclosure agreement in place between Mr. Tarone and Kaleyra specifically allowing disclosure of confidential information to Mr. Tarone.  This letter was on Campaign Registry, Inc. letterhead and purported to be sent on behalf of Campaign Registry's Board of Directors.

## KALEYRA AND TCR EXECUTIVES ATTEMPT TO FRAME MR PETERS FOR UNAUTHORIZED ACCESS TO THE COMPANY'S COMPUTER NETWORK AND RESOURCES

125.    Shortly after Kaleyra placed Mr. Peters on administrative leave, a Macintosh computer named "Bill's Mac" accessed the company's network without authorization on multiple occasions from October 6, 2022 to October 26, 2022. The computer logged into the network account for Bill Peters (bill.peters@campaignregistry.com) successfully on October 6, 2022 on the first try and without requiring a password reset.

126.    The following is a timeline of relevant facts:

- October 4 at 4:00 PM: Mr. Peters received notice via email that he was being placed on administrative leave (not terminated) and then all network access was abruptly cut off. Soren Schafft contacted Mr. Peters within a few minutes to coordinate picking up all company items in his possession.

- October 5, 10:00 AM: Soren Schafft drove to Mr. Peters' house and picked up his computer, files, and all company property including keys and access cards.

- October 5, Afternoon:  Mr. Peters spent over 2 hours working with Eric Simmons to change passwords and "password reset" information, including backup emails and mobile numbers for receiving SMS for all company related accounts.

- By COB (5-6 PM) on October 5: Mr. Peters no longer had access to company accounts or any ability to do a password reset on any of them.

127.    According to Eric Simmons, the Network Operations Manager of TCR, only he and Soren Schafft then had the new password information, and he did not share the information with anyone else.

128.    Mr. Peters has never owned or used a Macintosh computer.

129.    The Macintosh computer at issue was very old according to Eric Simmons (roughly 10 years old).

130.    Access to older computers is typical of households who frequently upgrade and do not immediately discard the older computer. Several people mentioned in this complaint are Mac users who fit this profile, namely Soren Schafft, Tor Soevik, Giacomo Dall'Aglio and Michael Ford.

131.    The Break-In was reported to members of the Kaleyra Board of Directors (specifically John Mikulsky and Avishay Katz) via an anonymous internal whistleblower complaint submitted in early November by a then current employee in operations. The whistleblower stated that the network access could have only been done by someone who knew the new password, and was therefore an inside job. The Board forwarded the complaint for further investigation by the Board's Audit Committee. The investigation revealed that the whistleblower was Ricardo Cavero who was fired shortly after the Kaleyra Board learned that he was the whistleblower.  In a continued effort to frame Mr. Peters for the computer break in, Kaleyra demanded in a Board approved draft severance agreement on 12/27/22 that Mr. Peters return "a Macintosh computer used by Employee between 10/6/22 and 10/26/22 to access the Company's Google Cloud services."  Mr. Peters did not own and did not use a Macintosh computer as alleged in the draft severance agreement.

132.    Someone who owned an old Macintosh computer and knew the new password conducted the first of multiple cyber intrusions on October 6. It would be impossible to gain access on the first attempt without either knowing the password or having the password reset email account or mobile phone number and resetting the password before attempting. Additionally, for this to have occurred within less than a day of retrieving Mr. Peters' computer and changing all of the passwords, this action was likely planned ahead of time. As of October 6, Mr. Peters was not terminated and was only on administrative leave. This was a premeditated

attempt to create an issue whereby they could fabricate a "due cause" termination and deny Mr. Peters his severance.

## COUNT I-TORTIOUS INTERFERENCE WITH CONTRACT

133.    Mr. Peters incorporates paragraphs 1 through 132 by reference.

134.    Mr. Peters was an employee of Buc Mobile, Inc. and had a written employment agreement with Buc Mobile, Inc.  Mr. Peters was also an officer of Campaign Registry, Inc., although he did not have a written employment agreement with Campaign Registry, Inc.

135.    Buc Mobile, Inc.  is a Delaware Corporation.  Buc Mobile Inc. is and was at all times relevant to this action a wholly owned subsidiary of Kaleyra S.p.A., which was in turn a wholly owned subsidiary of Kaleyra, Inc., which is a Delaware corporation.

136.    Mr. Peters did not have an employment agreement with Kaleyra, Inc. and was not employed by Kaleyra, Inc.

137.    Kaleyra, Inc. executives and agents knew of the employment contract between Mr. Peters and Buc Mobile.  Mr. Peters, as an employee of Buc Mobile, interacted with executives of Kaleyra, Inc. on an almost daily basis.

138.    Kaleyra, Inc. tortiously interfered with the employment agreement between Mr. Peters and Buc Mobile, Inc. by causing Buc Mobile to fire Mr. Peters on the pretense that he had violated his confidentiality agreement with Buc Mobile.  The letter terminating Mr. Peters was sent by Mr. Dall'Aglio from his Kaleyra email account.  Mr. Dall'Aglio was the Chief Financial Officer of Kaleyra, Inc.  This was done in bad faith and with willful and wanton disregard for Mr. Peters' rights.

139.    By so acting, Kaleyra was not in good faith pursuing any legitimate profit-seeking activities, but was instead seeking maliciously and in bad faith to injure Mr. Peters.  Kaleyra

fabricated a false record to purportedly justify Mr. Peters' termination "for cause."  Kaleyra was

acting in bad faith to punish Mr. Peters' bid for TCR and to cover up, and retaliate against Mr.

Peters for, the numerous issues discussed above.

140.    Mr. Peters has been damaged as a result and is entitled to reinstatement to the

same position he held before the retaliatory action or to an equivalent position, and compensation

for lost wages, benefits, and other remuneration, together with interest thereon, as well as

reasonable attorneys' fees and costs as well as punitive damages.

## COUNT II-DEFAMATION AND DEFAMATION PER SE

141.    Mr. Peters incorporates paragraphs 1 through 140 by reference.

142.    After being placed on administrative leave but before being wrongfully

terminated, officers of Kaleyra told employees of Kaleyra and TCR that Mr. Peters had been

terminated.  These statements were false when made and made with the intent harm Mr. Peters.

Further, after October 17, 2022, officers of Kaleyra told employees and others that Mr. Peters

had been terminated for cause.  These statements were false and made with the intent to injure

Mr. Peters.  These statements constitute defamation per se because they have prejudiced Mr.

Peters in his job.

143.    Mr. Schafft also falsely accused Mr. Peters of unauthorized access of the Kaleyra

and Campaign Registry computer systems and published this information to the other executives

and employees of Kaleyra and the Campaign Registry.  These statements were false and made

with the intent to harm Mr. Peters' reputation and prejudiced Mr. Peters in his job, and thus these

statements constitute defamation per se.

144.    As a result of Kaleyra's defamation of Mr. Peters, his reputation has been harmed.

No one in the industry will connect with him any longer on LinkedIn.   He has applied for

positions in several companies as a 10DLC expert / finance and never even received a return email.  His attempts to connect to others via LinkedIn are being ignored.  After Mr. Peters left TCR, one employee who wanted to know what happened was told by Mr. Schafft "I can't tell you what happened, but I can tell you he has a criminal defense attorney", clearly meaning to imply that Mr. Peters had committed some criminal act.  This constitutes defamation per se.

145.    All of the above actions and statements were done in bad faith and with willful and wanton disregard for Mr. Peters' rights.

146.    As a result, Mr. Peters has been damaged and is entitled to his actual damages as well as punitive damages and an award of his attorneys' fees and costs.

## COUNT III-CIVIL CONSPIRACY

147.    Mr. Peters incorporates paragraphs 1 through 146 by reference.

148.    Kaleyra, and TCR employees, not yet identified but on information and belief likely including Soren Schafft, Tor Soevik, Giacomo Dall'Aglio, and Michael Ford, conspired to commit a computer breach of the Kaleyra and TCR computer systems and frame Mr. Peters for the breach so that Kaleyra would have manufactured grounds to cause TCR to terminate him for cause.

149.    Mr. Peters has been damaged as a result in an amount to be determined at trial together with interest thereon, as well as reasonable attorneys' fees and costs as well as punitive damages.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury issue on all issues triable by jury.

## PRAYER FOR RELIEF

Wherefore, Mr. Peters requests the following:

Damages caused by the tortious interference.

Damages caused by the acts of defamation.

Damages caused by his being framed for a computer break in.

Punitive damages.

Prejudgment and post judgment interest.

Attorneys' fees and costs.

Such other and further relief as the Court deems just and warranted.


DAILEY LLP

By:  _/s/ Andrew H. Sauder_
      Andrew H. Sauder (No. 5560)
      1201 N. Orange St., Suite 7300
      Wilmington, DE 19801
      (302) 468-5007

      Ronald J. Schutz (*pro hac vice* forthcoming)
      Brandon A. Carmack
      ROBINS KAPLAN LLP
      800 LaSalle Ave., Suite 2800
      Minneapolis, MN 55402

Dated:  September 26, 2023      *Counsel for Plaintiff William Peters*