IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WILLIAM PETERS

      *Plaintiff,*

   v.

KALEYRA, INC.

      *Defendant.*

No. 1:23-cv-01051-SB

Andrew Hall Sauder, DAILEY LLP, Wilmington, Delaware; Brandon A. Carmack, Ronald J. Schutz, ROBINS KAPLAN LLP, Minneapolis, Minnesota.

      *Counsel for Plaintiff.*

Jared Thomas Green, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, Delaware.

      *Counsel for Defendant.*

### MEMORANDUM OPINION

September 27, 2024

BIBAS, *Circuit Judge*, sitting by designation.

Federal law strongly favors arbitration. Because Buc Mobile, Inc. fired William Peters, he sued its parent company, Kaleyra, Inc. But Peters had signed an employment contract containing an arbitration clause. Two of his three claims fall within that clause's sweep; one does not. So I grant the motion to dismiss and compel arbitration on those two claims while denying it for the third.

## I. Peters Was Fired, So He Sued

William Peters cofounded Campaign Registry, Inc., a wholly owned subsidiary of Buc Mobile, another company he had cofounded. Compl., D.I. 1 ¶¶ 7, 13. Campaign Registry screens text-message campaigns, like those sent by politicians, to block spam. *Id.* ¶ 36. In 2018, Kaleyra bought Buc Mobile. *Id.* ¶ 7. Following that deal, Peters "became the U.S. V.P. of Finance with primary responsibility for all related American entities, including Kaleyra, Inc., Buc Mobile, Inc., and Campaign Registry Inc. (USA)." *Id.* ¶ 7 (punctuation fixed). But his official employment contract was with Buc Mobile. *Id.* ¶ 134.

In this role, Peters wore many hats. He was an "officer of both Buc Mobile and Campaign Registry," he was a "fiduciary of Kaleyra," and he "interacted with executives of Kaleyra, Inc. on an almost daily basis." *Id.* ¶¶ 66, 137.

In early 2022, Kaleyra authorized Peters and his colleagues to sell Campaign Registry. *Id.* ¶¶ 72–73. The Director and CEO of Campaign Registry, Soren Schafft, had previously made a mutual nondisclosure agreement with a potential buyer. *Id.* ¶¶ 73–75. As part of this process, Peters sent the potential buyer a "business overview." *Id.* ¶ 84.

But by the summer of 2022, the deal had soured. Schafft backed off the discussions and terminated the nondisclosure agreement. *Id.* ¶ 88. The potential buyer kept pursuing the deal, but Kaleyra rebuffed its attempts. *Id.* ¶¶ 91–106. So Peters made a move himself. In September 2022, he offered to buy Campaign Registry from Kaleyra for $40 million. *Id.* ¶ 108.

About a week later, a Kaleyra executive put Peters on administrative leave. *Id.* ¶ 110. The executive accused Peters of violating a confidentiality agreement by

2

sharing confidential information with the potential buyer. *Id.* ¶ 115. Schafft then took Peters's credentials away so that he could not access company accounts or networks while on administrative leave. *Id.* ¶ 126. Kaleyra told its and Campaign Registry's employees that it had fired Peters. *Id.* ¶ 142.

While Peters was on leave, a computer named "Bill's Mac" logged into the network account for bill.peters@campaignregistry.com. *Id.* ¶ 125. Kaleyra investigated this as a break-in. *Id.* ¶ 131. Two weeks later, a Kaleyra executive told Peters he was officially fired for breaching confidentiality by giving the buyer information. *Id.* ¶¶ 123–24. Kaleyra told its employees and others that it had fired Peters "for cause." *Id.* ¶ 142. Schaftt also told Kaleyra and Campaign Registry executives and employees that Peters was the one who had broken into the network. *Id.* ¶ 143.

Peters sued Kaleyra for tortious interference with his contract with Buc Mobile, defamation, and civil conspiracy to frame Peters for the break-in. *Id.* ¶¶ 133–49. Kaleyra responded by filing a motion to compel arbitration and thus dismiss. D.I. 6. Because Kaleyra is a Delaware corporation and Peters is a resident of Virginia, this Court has diversity jurisdiction under 28 U.S.C. § 1332. Compl. ¶¶ 5, 8.

## II. I Take Judicial Notice of Some of Kaleyra's Documents

Kaleyra requests that I take judicial notice of several documents not contained in or attached to the Complaint. *See* D.I. 8. I can take judicial notice of facts that (1) are "generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." Fed. R. Evid. 201(b). But I must do so only "sparingly at the pleadings stage." *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007).

Under Third Circuit law, I can take judicial notice of public records. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3rd Cir. 2014). I can also consider documents that are "integral to or explicitly relied upon in the complaint." *Id.* The Third Circuit has "not articulated an explicit test" about what makes a document "integral to" a complaint. *Lepore v. SelectQuote Ins. Servs., Inc.*, No. 22-3390, 2023 WL 8469761, at *2 (3d Cir. Dec. 7, 2023). But its precedents suggest that when a plaintiff's claims hinge on the contents of the document, the document is "integral to" the complaint. *See Mele v. Fed. Rsrv. Bank of N.Y.*, 359 F.3d 251, 256 n.5 (3d Cir. 2004); *Lepore*, 2023 WL 8469761, at *2.

I take judicial notice of Exhibits 1 and 2 in D.I. 8. These exhibits are SEC filings, which are matters of public record. *Schmidt*, 770 F.3d at 249.

But I cannot consider Exhibits 3 and 4, which are arbitration filings. D.I. 8. Kaleyra has not proven that they are matters of public record. The complaint does not explicitly mention that Peters has demanded arbitration in a related matter. And none of his three legal claims hinge on the contents of the arbitration filings. So I cannot take judicial notice of Exhibits 3 and 4.

Finally, I can and do consider Exhibit 5, Peters's employment contract with Buc Mobile. For the reasons articulated below, that contract is integral to the complaint.

4

### III. I APPLY THE MOTION-TO-DISMISS STANDARD

The Third Circuit applies one of two different standards to a motion to compel arbitration: either the motion-to-dismiss standard or the summary-judgment standard. *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772–74 (3d Cir. 2013). To decide which applies, I must look at only (1) the pleadings and (2) documents attached to the motion to compel arbitration that are "integral to" the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014) (internal quotation marks omitted). If, after reviewing those documents, I decide that there is a valid agreement to arbitrate, I must apply the Rule 12(b)(6) motion-to-dismiss standard to the motion to compel arbitration "without discovery's delay." *Guidotti*, 716 F.3d at 776 (internal quotation marks omitted). But if I see no valid arbitration agreement, or if the plaintiff has raised facts sufficient for me to doubt the arbitration agreement's existence, I must order "limited discovery" on that factual dispute and then apply the Rule 56 summary-judgment standard to decide if there is a valid arbitration agreement. *Id.*

Peters argues that I must apply the summary-judgment standard because the complaint neither mentions nor attaches an arbitration agreement. D.I. 12, at 18–19; D.I. 19, at 1. But Kaleyra tells me that I can consider a document outside the complaint (Peters's employment agreement with Buc Mobile) that makes its affirmative defense of arbitrability apparent. D.I. 7, at 7–8. It contends that this agreement is integral to Peters's complaint. D.I. 20, at 1. I agree.

5

The employment contract is integral to two of Peters's three claims because they depend on what it says. First, Peters claims that Kaleyra tortiously interfered with his employment contract with Buc Mobile by "causing Buc Mobile to fire [him] on the pretense that he had violated his confidentiality agreement." Compl. ¶ 138. Under Delaware law, tortious interference depends in part on (1) whether Peters had a contract with Buc Mobile, (2) whether Kaleyra was a party to that contract, and (3) whether Buc Mobile breached that contract because Kaleyra caused it to do so. *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 884 (Del. Ch. 2009). So that claim hinges on the contents of the contract, including who was a party to it and how it defines a breach.

Second, Peters claims that Kaleyra "conspired" to frame Peters for a computer system break-in "so that Kaleyra would have manufactured grounds to cause [Peters to be] terminat[ed] … for cause." Compl. ¶ 148. Under Delaware law, civil conspiracy is not itself a "cause of action; it must be predicated on an underlying wrong." *Kuroda*, 971 A.2d at 892. Peters bases his civil-conspiracy claim on tortious interference with his employment contract. *See OptimisCorp v. Waite*, No. 8773-VCP, 2015 WL 5147038, at *56 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Table) (Del. 2016); Compl. ¶ 148. Because this claim also depends on what the contract says, I consider the contract.

Evaluating the contract under *Guidotti*, I conclude that the motion-to-dismiss standard is fitting. The contract includes an express agreement to arbitrate. D.I. 8, at 59. And Peters does not dispute the agreement's existence or validity. D.I. 19, at 1.

6

All he disputes is whether a nonsignatory to that agreement can compel arbitration of his claims—a pure question of law. *Id.* So I consider the motion under the Rule 12(b)(6) standard.

True, Peters brings a third claim for defamation that does not depend on the employment agreement's contents. But I see no reason to apply a different standard to that claim. The rule against looking at documents outside of the complaint on a motion to dismiss is predicated on fair notice. But when a plaintiff relies on the document to craft part of his complaint, as Peters did, he is on notice about the document's content. *PBGC v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Plus, a document can be "integral to" the complaint even if it is not integral to every claim in the complaint. *Burlington*, 114 F.3d at 1426. So I apply the motion-to-dismiss standard to the motion to compel arbitrating all three claims.

The Third Circuit has implicitly taken this approach. In *CardioNet*, the court reviewed a motion to compel arbitration under the motion-to-dismiss standard after deciding that the arbitration clause, which was not attached to the complaint, "appears in a contract" that was "relied upon in the Complaint." 751 F.3d at 168 n.2. The court then applied that standard to each claim in the complaint, even though the court expressly concluded that some of them did not depend on the contents of the contract. *Id.* at 168 n.2, 175. I follow that approach.

### IV. SOME OF PETERS'S CLAIMS CAN BE ARBITRATED

Because there is an arbitration agreement, I turn to the Federal Arbitration Act, which governs here. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009). On a motion to compel arbitration, I must consider "(1) whether there is a valid agreement

7

to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement." *Flintkote Co. v. Aviva PLC,* 769 F.3d 215, 220 (3d Cir.2014) (internal quotation marks omitted).

Applying the motion-to-dismiss standard, I "accept as true the factual allegations set forth in the Complaint" and may "consider the substance of the contracts that ostensibly compel arbitration." *CardioNet*, 751 F.3d at 168 n.2. I must grant the motion unless Peters can allege facts sufficient to show that the employment agreement is "not clear enough on [its] face to establish that the parties agreed to arbitrate." *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 329 (3d Cir. 2022).

### A. There is a valid arbitration agreement that lets Kaleyra compel arbitration as a nonsignatory

Peters alleges that he never agreed to arbitrate with Kaleyra. D.I. 12, at 4. The arbitration clause was part of his employment agreement with Buc Mobile, to which Kaleyra was not a party. *Id.* Kaleyra does not contest this. But it counters that it can still compel Peters to arbitrate even as a nonsignatory to the agreement. D.I. 7, at 8. I agree.

"Under the FAA, agreements to arbitrate must be treated like 'all other contracts.'" *MZM Constr. Co., Inc. v. N.J. Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 402 (3d Cir. 2020) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)). So I must refer to "traditional principles" of applicable state law to decide whether they "allow a contract to be enforced by or against nonparties to the contract." *Arthur Andersen*, 556 U.S. at 631 (internal quotation marks omitted).

8

No party argues which state's law should apply. Each party at times cites Delaware law or federal courts interpreting Delaware law. Because neither party argues that the "motion is governed by the law of any jurisdiction other than the forum state, [I] too will apply the law of Delaware." *Flintkote*, 769 F.3d at 220.

Under Delaware law, nonsignatories to a contract can compel a signatory to arbitrate their claims if they count as third-party beneficiaries. *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 431 (Del. Ch. 2007). A third party is a beneficiary to a contract if (1) the contracting parties intended the contract to benefit the third party, (2) they intended the benefit as a gift or to satisfy a pre-existing obligation to the third party, and (3) conferring this benefit was a "material part of the parties' purpose in entering into the contract." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022). Kaleyra claims that it is a third-party beneficiary to Peters's employment agreement with Buc Mobile and thus can enforce Buc Mobile's arbitration agreement with Peters. I agree.

First, the parties intended for Peters to do work to benefit Kaleyra. The employment agreement makes it Peters's "dut[y]" to "devote his full time and attention to the business and affairs of the Company and its affiliates." D.I. 8, at 53. An "affiliate" is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate, Black's Law Dictionary* (11th ed. 2019); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 339 (Del. 2022) (using dictionaries to interpret the plain meaning of contracts).

9

Kaleyra is an "affiliate" of Buc Mobile because it owns Buc Mobile. Compl. ¶ 7. So Peters's employment benefited Kaleyra because he agreed to work for it.

Second, the parties intended to give Kaleyra that benefit. In this context, a benefit is a gift when the intended beneficiary does not pay for what it gets. Restatement (Second) of Contracts § 302 cmt. c; *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, No. CIV.A. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001). Buc Mobile, not Kaleyra, was responsible for paying Peters. *See* D.I. 8, at 53. So Kaleyra got a gift from this arrangement.

Finally, conferring this benefit was a material aspect of the agreement. Indeed, Peters's main duty under the contract was to do work to benefit Buc Mobile and its affiliates. Because Kaleya is a third-party beneficiary to the employment contract, it can enforce the arbitration agreement in that contract.

**B. Some of Peters's claims fall within the arbitration agreement**

State law principles of contract interpretation govern the scope of the arbitration agreement. *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 522 (3d Cir. 2019). Under Delaware law, courts follow two steps to determine scope. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002). First, they ask if the scope of the arbitration clause is broad or narrow. *Id.* Second, they decide whether each legal claim falls within the scope of the arbitration provision. *Id.* If the provision is broad, they compel arbitration on all claims that "touch on contract rights or contract performance." *Id.* By contrast, if the clause is narrow, they compel only those claims that "directly relate[] to a right in the contract." *Id.*

10

This arbitration clause is broad. It requires the parties to arbitrate "[a]ny controversy arising out of or relating to th[e] Agreement." D.I. 8, at 53. That language signals the parties' intent to arbitrate "all possible claims that touch on the rights set forth in the[] contract." *Parfi Holding*, 817 A.2d at 155.

Peters's tortious-interference and civil-conspiracy claims relate to contractual rights. Peters alleges that Kaleyra tortiously interfered with his contract by spurring Buc Mobile to think that Peters had violated the contract's confidentiality clause, warranting his firing. Compl. ¶ 138. Whether that is true turns in part on whether Buc Mobile breached its contract with Peters. *See Bhole*, 67 A.3d at 453. And that hinges in part on the terms of the confidentiality clause and whether Peters violated them. So that claim relates to the parties' "duties and obligations under the" contract. *Parfi Holding*, 817 A.2d at 156.

Peters's civil-conspiracy claim does too. Peters contends that Kaleyra conspired with others to frame him for a security breach, justifying firing him for cause. That claim also turns in part on the meaning of the parties' duties under the contract because it rests on the underlying tortious-interference claim. I must compel arbitrating both claims.

By contrast, Peters's defamation claim does not relate to rights under the contract. Peters asserts that Kaleyra defamed him by telling his colleagues that it had fired him "for cause." Compl. ¶ 142. But even an at-will employee without an employment contract can be fired "for cause." *See Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 103 (Del. 1992). So the defamation claim is "beyond the contract and rest[s] on an

independent" basis for liability: state tort law. *Id.* at 158. It would be "assertable had there been no … [a]greement." *Parfi Holding*, 817 A.2d at 157. Thus, it does not fall within the scope of the arbitration clause. Even strong presumptions in favor of arbitration do not "trump basic principles of contract interpretation." *Id.* at 156. I cannot compel Peters to arbitrate the defamation claim.

* * * * *

Arbitration clauses are creatures of contract. I must enforce them according to their terms, applying state contract law. Because some of Peters's claims fall within the arbitration clause and Kaleyra can enforce that clause under state law, I grant in part and deny in part Kaleyra's motion to dismiss and motion to compel arbitration.

_____
UNITED STATES CIRCUIT JUDGE